JUDE G. GRAVOIS, Judge.
 

 |sIn this child in need of care proceeding, appellant S.M.
 
 [1]
 
 appeals a judgment that adjudicated his minor child, B.A., in need of care as to him. After thoroughly reviewing the applicable law and the record, for the reasons that follow, we reverse the trial court’s judgment finding B.A. to be a child in need of care as to his biological father, S.M., and dismiss the petition as to S.M.
 

 FACTS AND PROCEDURAL HISTORY
 

 B.A., the minor child, was born on February 25, 2008 to B.J., whose boyfriend, D.A., Sr., signed the birth certifícate as the child’s father. Because B.A. was born drug-affected, he was placed into foster care immediately following his birth and release from the hospital, along with his one-year-old brother, D.A., Jr., pursuant to an Instanter Order filed on February 28, 2008.
 
 [2]
 
 The District Attorney filed a Petition for Children in Need of Care on March 27, 2008 for both children |4as to mother, B.J., and their father, D.A., Sr.
 
 [3]
 
 Meanwhile, their mother, B.J., entered residential treatment for drug addiction and behavioral therapy for other issues that prevented her from parenting her sons. D.A., Sr., in the meantime, was incarcerated on drug charges.
 

 Approximately seven months after B.A.’s birth, in June of 2008, paternity testing revealed that D.A., Sr. was not B.A.’s biological father. Sometime in August of 2008, B.A.’s mother, B.J., told her case workers with the Office of Community Services (OCS) that S.M. might be B.A.’s biological father. On October 30, 2008, OCS contacted S.M. with the allegation of paternity. He proceeded to provide OCS with a DNA sample in November of 2008. The DNA test results dated November 18, 2008 revealed S.M. to be the biological father of B.A.
 

 S.M. appeared at a hearing in the case in Juvenile Court on December 9, 2008 without an attorney and without a petition having been filed as to him. At the hearing, S.M. admitted to having a casual sexual relationship with B.J. around the time of B.A.’s conception. He testified that he wanted custody of B.A. and described his employment, housing and available family support. He stated that he was currently living in New Orleans East, having previously lived in Avondale at a specific address given by him. He said he knew when B.J. was pregnant that he could possibly be the baby’s father. B.J. told him, however, that he was not the baby’s father. B.J. did not tell him when the baby was born and he did not know the baby was in foster care until B.J. contacted him sometime during the summer of 2008.
 

 LCase workers from the Infant Team and OCS testified at this hearing that S.M. was cooperating fully with them and was actively participating in their recommended case plan.
 

 
 *907
 
 On December 10, 2008, the day after this hearing, the District Attorney filed a Child in Need of Care petition alleging that B.A. was in need of care as to S.M. The record indicates that S.M. was not served with this Petition because the court had the wrong address for him.
 
 [4]
 
 S.M. did not appear in court for a hearing on January 6, 2009 but did appear for the adjudication hearing on March 3, 2009. The adjudication hearing was continued, as to him, until March 24, 2009.
 

 On March 20, 2009, counsel for S.M. filed a Motion to Continue, Motion to Dismiss, and an Exception of Vagueness, all of which were in due course denied by the trial court. On March 24, 2009, the juvenile court conducted an adjudication hearing on the child in need of care petition as to S.M. After hearing testimony from S.M., B.J., the OCS caseworker, and B.A.’s foster mother, the juvenile judge adjudicated B.A. in need of care as to S.M. The judge found that S.M.’s failure to contact B.J. while she was pregnant and failure to provide financial support to her both while pregnant and after the baby was born were inexcusable. She found that at the very least, after August of 2008, when B.J. told him he could be B.A.’s father, S.M. inexcusably failed to contact OCS regarding his possible paternity and moreover failed to take any steps to involve himself in the baby’s life until contacted by OCS in October of 2008. The court also chastised OCS for not being more prompt in contacting S.M. regarding a paternity test once B.J. told case workers in August of 2008 that S.M. was possibly B.A.’s father.
 

 IfiAt the same hearing, immediately after pronouncing the adjudication, the trial court took up the matter of custody. The trial court then heard from case workers about S.M.’s continued cooperation with the case plan and that they had progressed to the point of S.M. having an unsupervised overnight visit with B.A. The judge then ruled that B.A. would continue to have unsupervised visits with S.M., but that legal custody would remain with OSC at that point.
 

 Another hearing was held on April 28, 2009, wherein the court granted full custody of B.A. to S.M., subject to three additional months of supervision by OCS to ensure a smooth transition.
 
 [5]
 

 On May 12, 2009, S.M. appealed the juvenile court’s adjudication of March 28, 2009, its denial of his motion to dismiss the Petition, and the disposition ruling of April 28, 2009 that ordered three additional months of supervision.
 

 ASSIGNMENTS OF ERROR
 

 On appeal, S.M. argues five assignments of error:
 

 1. The trial court erred when it denied S.M.’s Motion to Dismiss as the Petition to Adjudicate was insufficient on its face and therefore deficient under the rules as stated in the Children’s Code.
 

 2. The trial court erred when it denied S.M.’s objections to the vagueness of the petition as the petition did not set forth facts against which S.M. could defend.
 

 3. The trial court erred when it proceeded with the hearing despite the lack of service on S.M. and the failure of S.M. to receive the appropri
 
 *908
 
 ate notices, therefore violating S.M.’s constitutional rights.
 

 4. The trial court erred when it granted the District Attorney’s Petition to Adjudicate finding S.M. guilty of neglect.
 

 5. The trial court erred when it continued jurisdiction of the juvenile court at the disposition hearing instead of dismissing the case.
 

 |
 
 .APPLICABLE LAW
 

 A child in need of care proceeding is governed by the Children’s Code, article 601,
 
 et seq.
 
 LSA-Ch.C. art. 603 defines “neglect” as “the refusal or unreasonable failure of a parent or caretaker to supply the child with necessary food, clothing, shelter, care, treatment, or counseling for any injury, illness, or condition of the child, as a result of which the child’s physical, mental, or emotional health and safety is substantially threatened or impaired. Neglect includes prenatal neglect....”
 

 The state shall have the burden to prove the allegations of the petition by a preponderance of evidence. LSA-Ch.C. art. 665. In cases involving the custody of children, the trial court is vested with a vast amount of discretion.
 
 State ex rel. AR,
 
 99-0813 (La.App. 1 Cir. 9/24/99), 754 So.2d 1073.
 

 DISCUSSION ON ASSIGNMENTS OF ERROR
 

 Insufficiency and vagueness of petition
 

 In his first two assignments of error, S.M. argues that the trial court erred in denying his Motion to Dismiss, arguing that the Petition was insufficient on its face and therefore deficient under the rules as stated in the Children’s Code, and further that the trial court erred in denying his objections as to the vagueness of the petition. S.M. cites LSA-Ch.C. art. 657, which states that “all objections to the proceedings, including objections based on defects in the petition and defenses capable of determination as a matter of law, may be raised by a motion to dismiss.”
 

 S.M. objected to the Petition on the grounds that the allegations contained therein were insufficient and too vague to defend. He argued that the petition failed to comply with LSA-Ch.C. art. 634, which requires that the petition
 
 shall
 
 set forth with specificity “[fjacts which show that the child is a child in need of care, | ^including the acts or omissions of either parent which caused or contributed to the child’s condition.” The judge denied the motion, finding that S.M. was sufficiently aware of the allegations against him to defend them.
 

 The Petition filed on December 10, 2008 relative to S.M. stated that
 

 “[B.A.] is a CHILD IN NEED OF CARE as to his father, [S.M.], because the child is the victim of neglect, all occurring from February 25, 208[sic] to present, all as within violation of Children’s Code Art 606(A)(2).”
 

 S.M. argues that the insufficiency and vagueness of the petition did not provide him with sufficient information to prepare his defense, including determining which witnesses or what evidence to produce at the adjudication hearing on March 24, 2009.
 

 The petition in this particular case was obviously both deficient and vague. It alleged no specific facts, acts or omissions of S.M. that caused or contributed to the child’s condition. The petition merely alleges that the child was the victim of S.M.’s neglect, which is a conclusion, not a fact.
 

 We find, however, that S.M. was not prejudiced by the deficiencies in the petition. He attended the December 9, 2008 hearing, albeit before he was named in a petition and before he had hired counsel. At that hearing, during his testimony,
 
 *909
 
 the trial judge informed him of the basis for the neglect allegation, which was that at some point he knew that B.J. was pregnant, that there was a possibility the baby was his, that he did not contact her at all after he knew the baby was born to inquire about him, and that he did not provide any financial support to B.J. during her pregnancy or to the baby after he was born. It is clear from the transcript of the adjudication hearing held on March 24, 2009 that S.M. was aware of the allegations and was able to testify and cross-examine the witnesses about them. Accordingly, we decline to find that, with respect to this particular case, the trial 1 acourt’s denial of S.M.’s allegations of deficiency and vagueness of the petition constitutes reversible error.
 

 Lack of service and notice
 

 In his third assignment of error, S.M. argues that the trial court erred when it proceeded with the adjudication hearing despite lack of service of the petition and the required accompanying notice on him. He argues, thus, that his constitutional rights were violated.
 

 LSA-Ch.C. art. 639 provides that a notice shall be served with a petition and summons on every parent whose child is the subject of a child in need of care proceeding. This notice states, among other things, the consequences to a parent of the proceeding, that the parent has a right to counsel or appointed counsel if he cannot afford his own, and that a parent has the right to attend all hearings of his case and must attend as summoned, and the right to call witnesses on his behalf, and to question those witnesses brought against him.
 

 There is no evidence in the record that S.M. was ever served with the petition and the required accompanying notice. S.M. testified that no one ever told him that he was entitled to counsel, hired or court-appointed, but that he decided to hire an attorney on his own. The transcripts of the various hearings are devoid of any advice to S.M. regarding his rights in the proceeding as outlined in LSA-Ch.C. art. 639.
 

 The state argues in brief that at the hearing on January 6, 2009, at which S.M. was not present because the petition had been served at an incorrect address, the trial court appointed Mrs. Womble as his counsel, and she answered the petition with a general denial on his behalf, as per LSA-Ch.C. art. 649. Mrs. Womble was also the appointed attorney for B.J. and D.A., Sr., B.A.’s mother and | 1fllegal father. At this time, the adjudication as to S.M. was set for hearing on March 3, 2009.
 

 At the March 3, 2009 hearing, S.M. appeared and Mrs. Womble continued in her role as appointed counsel for him. She stated that she did not feel she had a conflict of interest representing the mother and S.M. but did feel a conflict existed regarding her continued representation of D.A., Sr., at which time another attorney was appointed to represent him. The State requested a continuance regarding the adjudication as to S.M., to which Mrs. Womble agreed and which the court granted. S.M. remained at the hearing and provided testimony.
 

 We find that the trial court’s appointment of Mrs. Womble as counsel for S.M. and its act of continuing the adjudication hearing until March 24, 2009, at which time S.M. appeared with counsel of his own choice, allowed S.M. to properly defend himself at the adjudication hearing. We do not hold that the trial court’s actions in appointing counsel for S.M. and granting a continuance alone automatically cures the lack of service on a defendant with a child in need of care petition or provide the mandatory notice and advice of rights. In this case, however, it is clear
 
 *910
 
 from the record that S.M. was able to fully defend himself and cross-examine the witnesses at the adjudication hearing. S.M. does not indicate what other witnesses he was prevented from calling in his defense. Accordingly, given the fact that S.M. was fully represented by retained counsel at the March 24, 2009 adjudication hearing, coupled with his voluntary appearance at the hearing and the extent of information and documentation provided to S.M. in advance of said hearing, we decline to find that, with respect to this particular case, the lack of service on S.M. with the petition and accompanying notice violated S.M.’s constitutional due process rights nor constitutes reversible error.
 

 |
 
 ^Merits of the adjudication
 

 In his next assignment of error, S.M. argues that the trial court erred when it granted the District Attorney’s Petition, finding that S.M. committed neglect of his son. For the following reasons, we agree with S.M. and reverse the judgment of adjudication.
 

 S.M. did not dispute that he had had a casual sexual relationship with B.J. around the time of B.A.’s conception and that he knew there was a possibility he could be the child’s father. He described how he met her in 2004 at a tattoo shop and that they became friends. He stated that they would meet up occasionally for sexual relations, but never had a one-on-one relationship. In his direct testimony, S.M. stated that he and B.J. met up once every two months or so. On cross-examination, he said that they met around three times per year over the four years that they were friends. B.J. testified that the meetings were more frequent but agreed they were sporadic and irregular in nature. She also testified that at this time she was living with D.A., Sr., her boyfriend.
 

 S.M. testified that he did not know B.J. was pregnant until she called him sometime in the fall of 2007. He said he had no contact with her until she called again in February of 2008 before she gave birth. She testified that she was very “loaded” during that conversation and couldn’t remember how it went or if she told him he could be the baby’s father. S.M. testified that he suspected that B.J. used drugs, but had never seen her do so. He said he had no physical contact with her while she was pregnant and had no contact number for her.
 

 S.M. testified that he next heard from B.J. while she was in residential drug treatment after the baby was born. Both S.M. and B.J. explained that she visited him at his house during the summer of 2008. During that visit, S.M. testified that he could tell that B.J. was using drugs. At that time, S.M. testified that B.J. told 11?him he was not the baby’s father. It was not until August of 2008 that B.J. told S.M. that he might be B.A.’s father and that the baby was in the State’s custody. After B.J. told S.M. that he could be the baby’s father, S.M. visited B.J. at her residential treatment facility, where she showed him pictures of B.A. She also told him that she told her case workers that he might be B.A.’s father, and that they would be contacting him. According to B.J., during that visit, she called her OGS case worker, Ms. Hunter, in S.M.’s presence to tell her that he could be B.A.’s father, and that S.M. and Hunter arranged a meeting. She testified that she gave his number to Ms. Hunter, her case worker at that time. S.M.’s testimony made no mention of a phone call with Ms. Hunter. B.J. noted that right after that visit, Hurricane Gustav came, which might have delayed OCS’s call to S.M. She approved of S.M. receiving custody of B.A. S.M. admitted that he did not contact OCS, but waited for them to contact him, which they did on October 30, 2008. He proceeded to give OSC a DNA sample in November, and test
 
 *911
 
 results dated November 18, 2008 revealed he was B.A.’s father.
 

 S.M. explained that he did not intervene because B.J. had told him several times that the baby was not his. She asked him not to come by the house she shared with D.A., Sr. because she was afraid that might cause trouble. He explained that he didn’t send her money while she was pregnant or afterwards because she had told him the baby was not his. He said that he never saw her while she was pregnant and did not know she had actually given birth until she visited him at his house during the summer of 2008. He said that she never told him he was possibly the baby’s father until August of 2008, whereupon he visited her at her residential treatment facility.
 

 At the hearing, B.J. confirmed that she had told S.M. several times that the baby was not his, both when she was pregnant and after the baby was born. She 113admitted that S.M. did not know she was using drugs while she was pregnant, though in fact she was. She stated that right after the baby was born, she was “pretty adamant” that the baby was D.A., Sr.’s. She said that the baby looked sort of like both men: D.A., Sr. is Puerto Rican and S.M. is African-American.
 

 After learning he was in fact the baby’s father, S.M. immediately requested visits with him. He met with the Infant Team, got a case plan, started seeing B.A. in supervised visits, and did everything he was supposed to do so he could get custody of his son. The case workers who testified at various hearings corroborated this testimony, stating that S.M. was “extremely compliant” and “fully cooperative,” participating fully in the case plan and never missing an appointment. Moreover, case workers who observed S.M. with the baby all agreed that he was very sensitive to the baby’s needs and placed those needs before his own, interacted with the baby very well, and understood the goals of the case plan and that it would take time for the baby to form a bond with him.
 

 Kay Evans, the investigator with OCS who was on the case from the beginning, testified that B.J. never mentioned S.M. to her as a possible father of B.A. until the DNA results excluded D.A., Sr. as his father.
 

 Tina Johnson, the case worker with OCS, stated that she was not on the case when B.A. was placed into foster care. She was given S.M.’s contact number by her former supervisor in October of 2008 as a possible father of B.A. She contacted him and thereafter he was fully cooperative. She had the opportunity to observe several supervised visits between S.M. and B.A, which she described as having gone very well. At the March 24, 2009 adjudication hearing, she stated that she saw no safety concerns about awarding S.M. custody of B.A. She also recommended dismissing the petition as to S.M. and awarding him full custody immediately.
 

 |14We find that under the particular facts of this case, the trial judge abused her vast discretion in finding that S.M. neglected the infant B.A. As indicated above, LSA-Ch.C art 603 defines neglect as “the refusal or
 
 unreasonable
 
 failure of a parent or caretaker to supply the child with necessary food, clothing, shelter, care, treatment, ... as a result of which the child’s physical, mental, or emotional health and safety is substantially threatened or impaired.” (Emphasis added.) It is apparent from the record that S.M. did not act unreasonably in his actions with respect to this particular child. He had only phone contact with B.J. while she was pregnant, and she consistently told him the child was not his at that time. She never asked him for any financial support, and in particular asked him not to come to her house to intervene. In light of B.J.’s testimony re
 
 *912
 
 garding her drug use and behavior during the relevant times (unknown to S.M.) and her admission that she consistently maintained that D.A., Sr. was the baby’s father until August of 2008 (at least as to S.M. and her case workers), we cannot fault his skepticism regarding the baby’s paternity and his resultant inaction.
 

 It is very interesting and telling to note that immediately after the judge adjudicated B.A. in need of care as to S.M., the focus of the hearing shifted to how well S.M. was following the case plan, and in particular how his success with the case plan had progressed to the point that the case worker was describing to the court a successful, recent overnight
 
 unsupervised
 
 visit between S.M. and B.A. The record further shows that a mere one month after being adjudicated neglectful, S.M. was awarded full custody of B.A. Indeed, one of the last minute entries in this record, made after S.M. received full custody of B.A., stated that B.A. was “thriving” in S.M.’s care.
 

 This court fully understands and appreciates that the juvenile court must take a stern view of fathers who refuse to take responsibility for the children they have [ 1!;created and whose neglect results in their children being removed from their homes, and must adjudicate them accordingly. We find, however, that based on the evidence presented, S.M.’s lack of intervention when he knew of B.J.’s pregnancy and later after she told him of the baby’s birth was not unreasonable. We further find that his lack of intervention even after August of 2008, when B.J. first told him he could be the father, was not unreasonable under the described circumstances in this particular case, and therefore does not constitute neglect as that term is defined in LSA-Ch.C. art. 603. Considering all of the particular facts and circumstances involved in this case, the trial court abused its vast discretion in adjudicating B.A. to be a child in need of care as to his father, S.M.
 

 Continuing jurisdiction of the juvenile court
 

 In his final assignment of error, S.M. argues that the trial court erred when it maintained continuing jurisdiction over the case at the disposition hearing on April 28, 2009 rather than dismissing the case. In light of our above reversal of the adjudication, this assignment of error is moot.
 

 CONCLUSION
 

 For the reasons expressed above, we reverse the trial court’s adjudication that found B.A. to be a child in need of care regarding his father, S.M., and dismiss the petition as to S.M.
 

 REVERSED.
 

 [1]
 

 . The initials of the child and the parties are used to protect the identity of the minor child. Uniform Rules, Court of Appeal, Rule 5-2.
 

 [2]
 

 . This appeal concerns only S.M.'s adjudication relative to B.A. It does not concern D.A., Jr.
 

 [3]
 

 . D.A., Sr. is referred to as B.A.'s father because he was B.A.'s legal father until such time as paternity testing excluded him as the biological father.
 

 [4]
 

 . The lack of service on S.M was discussed by the Court at a hearing on January 6, 2009. The transcript of the December 9, 2008 hearing shows that S.M. reported that he had lived at a certain address in Avondale prior to his current residence in New Orleans East. The address for service was for a different address in Avondale than reported by S.M.
 

 [5]
 

 . In the appellate briefs, it is claimed that the case was eventually dismissed sometime in July of 2009.